Good afternoon, ladies and gentlemen. This is the time for the argument on bank in the case of United States v. Larson and Robert Durer. And we will – we understand that the counsel are ready to proceed. Judge Bould is not with us in San Francisco and not participating in the argument, but he will review the tape recordings of the argument and is familiar with the briefs and will participate in the decision. With that, counsel, the appellant may proceed. Ness Thank you. My name is David Ness and I represent the appellant Patricia – Patricia Larson. The Court is aware the issue in this case is whether, at a bare minimum, Ms. Larson was entitled under the Sixth Amendment to the United States Constitution to question the government's witnesses about the length of the mandatory sentences that they were facing and the fact that the length of those sentences could only be reduced through motion of the government in exchange for the witness's testimony. The answer to this question, in our view, is yes. A criminal defendant must be given the opportunity not only to elicit evidence of motive of the government witness, but also to elicit why the witness is motivated to testify in favor of a party, in this case the government. Thorough cross-examination must be accorded so that the criminal defendant can establish not only what benefits the witness is seeking to obtain through his or her testimony, but also what will trigger that benefit. Now, in this case, the two witnesses were looking at lengthy mandatory terms. In Mr. Lemire's case, he was looking at a sentence of life without possibility of parole. There was no way he could get out of that sentence short of a motion by the government. That went not only to the benefit that he was seeking to obtain, or our cross-examination went not only to the benefit that he was seeking to obtain, that is, a chance to get outside of prison before he died, but it also went to the strength of his motive to testify on behalf of the government. Mr. Ness, did trial – were you trial counsel? Yes, sir, I was. Did you ever ask Ms. Portra what her mandatory minimum without plea was? I – my question to her, she had entered into the plea agreement, and my question was, and you are looking at a minimum mandatory five years in prison, is that right? At that point, the court – She answered yes. I don't – I – She answered yes, and there was no motion to strike, and you never asked her what her mandatory minimum without the plea agreement was. Now, secondly, that also happened with Mr. LeMire. He was never asked whether his mandatory minimum was life without possibility of parole. Isn't that so? I did not ask Mr. LeMire, but, Judge, if you read the transcript, I think it was very, very clear from the transcript that Judge Haddon was not going to let me go there. Did you – did you ever make a motion outside the presence of the jury and make an offer of proof as to what you would ask Mr. LeMire? Were you able to? I – when – during a break in the proceedings, I asked the judge for permission to recall the witnesses so that I could question them specifically about the length of their – of the minimum mandatory terms that they were facing. I argued to the court and suggested to the court at that time that under the Sixth Amendment, Ms. Larson should be accorded that opportunity. Do you have a record sign of that? I don't have the transcript, but I can – when I sit down, I can certainly get that for you. You've lived with this case for how long? Three years, two or three years, I believe, Your Honor. Have you been able to find a Federal appellate decision from any circuit, anywhere, that upheld disallowing a defendant from asking a cooperating witness about the mandatory minimum sentence he or she was facing? I have not. Most of the – most of the – involved mandatory minimum sentences. No. The questions cited in the government's brief, as well as those cited in the panel decision, involved guidelines and – or the Dainian case, such as it was decided by this circuit, involved a special guideline. Have you been able to find any case where a cooperating witness that required the government's motion for safety valve relief was facing life without possibility of parole? I have not, no, Judge. Any circuit. No circuit have I found one. Counsel, what's our standard of review? The standard of review, as the panel decision indicated – well, the panel decision indicated there was some confusion on that. What I would submit is that the standard of review is de novo. It is a constitutional issue. Constitutional issues aren't – are normally ineffective assistance counsel claims. Those sorts of claims are all under de novo standard. But – well, we're now – we're now in back, and we can clear up any confusion that may exist in our precedence. When the issue specifically under the Confrontation Clause is a limitation on particular questions at cross-examination, there's – there's some level at which we review for abuse of discretion, a limitation on cross-examination. So where does – at what point does de novo review come into the picture, and why? I think de novo review would come into the picture during the initial review. That is, to determine whether or not the defendant was accorded his or her right to confrontation. Whether or not the questions that were – that were asked on cross-examination were enough to satisfy the Sixth Amendment. Isn't that the scope of review? That is the – what we review for abuse of discretion, whereas the de novo question is whether all cross-examination was cut off. Whether all cross-examination into a – yeah, into a certain point, right. That would be the constitutional threshold. That would be correct. And then if there was – Beyond that, the question is whether the scope of cross-examination was unduly limited. I think that's – that's a good way to put it. So where the court permitted you to elicit the plea agreement, the fact that the witness was facing prison, the fact that – that the witness expected to face a substantial reduction in whatever the term of imprisonment was, and you and your co-counsel argued extensively to the jury, both in opening and closing, that those factors should be considered by the jury in weighing the credibility of the witnesses, coupled with the jury instruction that tells the jury they must view the testimony of that type of a witness with great caution. How was their constitutional deprivation sufficient to violate the Sixth Amendment? Because cross-examination needs to be sufficient. And in this case, the cross-examination was not sufficient because we were not allowed to expose the actual benefit that these witnesses were seeking to obtain through the plea agreement, especially in Mr. Lemire's case. So you think there's a constitutional significance between the jury being told that there is a substantial reduction in sentence that the witness hopes to achieve through testimony and telling the jury what that actual reduction would be? Is that what your argument is? I think in this case, yes. In this case, insofar as Ms. Larson was concerned, the only evidence linking her to this conspiracy were these two witnesses. They – their bias, their motivation needed to be sufficiently explored so that the jury could properly weigh their testimony. But I guess my question to you, I'm struggling with the quantitative or qualitative difference between knowing that a witness is testifying pursuant to a hoped-for benefit, a reduction in their own prison sentence, and your argument that the jury has to be told expressly what that reduction might be when nobody in the courtroom at that point knows, since there has not been a full sentencing proceeding, as to what a realistic sentence might be with or without cooperation. Both of these witnesses, Your Honor, had entered into plea agreements. Those plea agreements directly informed these two witnesses what their minimum and maximum sentences were. The important thing is what's in the witness's mind. The important thing for the jury to assess is what effect this life sentence – it wasn't a potential at this point. The life sentence was a minimum mandatory term – would have on Mr. Lemire's bias. There's no reduction, no quantification involved, is there? This is not a matter of math or guessing. The fact is, Lemire faced life in prison unless the prosecution filed the safety-filed motion. So it's not quantitative at all, is it? No. No, it wasn't quantitative at all. Mr. Ness, I don't understand what difference the mandatory minimum aspect makes at all, because you were able to elicit that only the prosecutor could make a motion to reduce sentence, and you were able to elicit that the witness certainly expected a break. So what more is there to be elicited? Well, I think in order to properly expose the witness's motivation, you have to look at what this witness has to gain or lose by the testimony. But both of the witnesses testified in response to cross-examination that they faced time in prison, that the prosecutor alone could help them reduce that time in prison, and that they didn't want to go to prison. So that seems to me to be the motivation from which you did extensively argue. I guess I have the same issue as Judge Rimer. I don't understand why there's a constitutionally significant difference between wanting to avoid jail time and wanting to avoid long jail time. Because I think certainly if someone in general is looking at life without possibility of parole, that would be something that the jury should take into account to determine exactly what this witness's motivation might be. But their motivation is the same to cut a deal with the prosecutor who could help them. But not the strength of the motivation. A jury may very well view a witness who's looking at no minimum mandatory term or a year minimum mandatory term different than someone who's looking at a life minimum mandatory term. Your point is that if the jury thought over here. I'm sorry. I have to raise my hand. As I understand your point, and you have two extremes, maybe not total extremes, but one of the witnesses was looking at five years. And that may not be as dramatic as a life. Do you think there's, makes any difference to the jury if we were only looking at a five year? If the only witness who was at issue here was someone with a five year mandatory minimum and the questions that were asked gave a sense that there was a substantial amount of time and a substantial reduction that she hoped to get, would you have the same argument? Or does this case really turn on the dramatic posture of the witness, what LaMere, who was looking at life and depended entirely on the prosecutor to get him off that hook by the safety valve motion? Does it make any difference to our analysis? In other words, does this case turn really on the fact of LaMere and that the argument with respect to Poitras wouldn't really be all that compelling or constitutional given what did come in? Well, given what did come in, again, I've got to go back to these two witnesses were the only evidence that Ms. Larson was involved in this conspiracy. I'm not asking for a bright-line rule here. I would think in general a minimum mandatory sentence is something that a jury should be informed of and would be interested in in assessing the witness's credibility. Is the case with Mr. LaMere perhaps a little stronger than Ms. Poitras? It could be. But ultimately, I think that that's for the jury to look at. I don't know. Well, let me get to the different aspect of this, as I recall, the prosecution agreed that this was a relevant question. How relevant may depend on the kinds of things we've been talking about, whether the person would be executed, possibly facing a death sentence, maybe that wouldn't matter either, or it's a life sentence and they'll have to spend his entire life in prison. Whatever it is, it was a relevant question. It was proper cross-examination, unless it's outweighed by some other reason. I mean, would this confuse the jury, distract the jury, take a great deal of time? What's your position on whether there's a legitimate reason to exclude this relevant information? Well, I would say, number one, the district court never went through that analysis. It never went through this, you might call it a hybrid 403 analysis, number one. But number two, any potential for prejudice, I think, could be ameliorated simply by a cautionary instruction, even at the time that the question is asked. And the Supreme Court stated in Davis v. Alaska that in that case, the State had a legitimate interest in protecting the confidentiality of juveniles, but the defendant shouldn't be made to bear the entire burden of that interest. Mr. Ness, the – in our Beardsley case, as you know, there's – I'm over here. In the Beardsley case, we have a three-pronged test to determine whether or not the defendant's constitutional right to confront the witness had been violated. The second of those tests has to do with whether there are other legitimate interests other than those of the defendant outweighing the presentation of the evidence. And in our United States v. Frank case, and I'm going to quote this, it says, it has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict. Isn't what you're asking here a violation of that very case? Wouldn't you be – if you were able to ask the questions that you would like to ask, would that not specifically inform the jury in this case of the consequences to the defendants that they were trying? Because they were in the same factual situation, were they not? Actually, neither one of these defendants were looking at minimum mandatory life. They were arguably in the same position as Ms. Poitra, but again, we're not talking about directly informing the jury that if you convict Ms. Larson, she's going to get a minimum mandatory five years. I think that a court could ameliorate that concern by telling the jury, this information is being elicited solely for you to evaluate the credibility of this witness in way, his or her testimony. You should not infer from the question or from the witness's answer that either one of these two defendants are looking at the same amount of time. Sentencing depends upon a number of factors, some that may or may not be present with respect to Ms. Larson, Ms. Poitra. So you don't think there's any concern at all, appropriate concern on the part of the government about what the jurors might have inferred had you been able to ask the questions that you wanted? I don't think with a proper limiting instruction, no, that there's a danger of undue prejudice to the government. And I think that's what we're looking at, because what we're weighing is the defendant's right to elicit information concerning bias against this possible potential for prejudice to the government. But, you know, this Court, as well as the Supreme Court, as well as every other court, has recognized that proper limiting instructions can serve to limit any potential for prejudice. Mr. Eberhardt. What weight do we give the fact, folks, what weight do we give the judge's comment that in ruling on your question, I think he said something to the effect that he, as the district court, would make the final decision on sentencing? That would not be true, would it not, if in fact the government didn't move for a safety bound? That's correct. And I think the judge's word is that sentencing is solely up to the court. And that, in fact, isn't true, because the government – I mean, it required a government motion, in essence government authorization, to reduce either one of these witnesses' potential sentence. And in fact, it wasn't the government – either the government or the judge's concern that the jury would learn about the sentence. Nobody mentioned that at all during the trial, did they? Mentioned the – That they were concerned that the jury would learn of the sentence. And that was the reason to exclude the evidence? You're absolutely right. Nobody suggested that, either the counsel or the court. That's absolutely right. And that was – That is the state of our law, is it not? I mean, the judge didn't say it, but the Ninth Circuit case was pretty clear on the date this case was tried that it is not a permissible piece of information for the jury to know out of fear both that they will compromise their verdict because they know what the potential punishment might be, and second, that they may nullify their duty as jurors to apply the law to the facts of the case. Isn't that what our case law says? Well, certainly the case law says you can't tell the jury that Ms. Larson is looking at X number of years if you convict her, but that isn't what these – what the cross-examination would elicit. What it would elicit is information about what the witnesses were looking at, not Mrs. Larson or Mr. Labrador. Well, in fact, the fact that you said – I'm sorry. I haven't had a chance to ask a question yet, if you don't mind. It just seems to me when I read the transcript that the district court judge was confused as to the difference between mandatory minimum sentence in the statute versus the guideline sentencing, which he would have to apply. And in this case, in fact, it was entirely within the government's discretion whether or not to bring the Rule 35 motion. So by eliciting the – and the Rule 35 motion is the only way to get a reduction in the mandatory minimum sentence, correct? That's correct, yes. Okay. So what you were trying to do – and I don't know if anybody fully articulated this, but it's to say that in this type of situation, there's more of an incentive for the witness, cooperating informant witness, to please the government. It doesn't matter where the – what the district court was going to do. What matters is what the government was going to do. And that was Claire Ninth Circuit's authority in Schoenberg at the time, right? That's correct, yes. Mr. Ness, you said that you were not looking, quote, I'm not asking for a bright-line rule. Aren't you asking that in every case where a witness has a mandatory minimum sentence, that the court is compelled to allow cross-examination on that issue in order to fully measure the amount of bias and motive? Judge, we're up here on this case, and there may be cases where, if this sort of process is not allowed. So you'd be satisfied with a remand, with an instruction that the judge can re-weigh the issue with a – what you called a hybrid 403 analysis? No. I would submit that Ms. Larson should go back for a new trial, because in this case, under these facts, there was a Sixth Amendment fact. And in a new trial, there would be a hybrid 403 analysis. There would not be a rule that all mandatory minimums must be revealed on cross-examination? I wouldn't be prepared to suggest that the Court make that rule for every single case. I would think that in the norm, yes. Well, in this case, wasn't it particularly important on the facts of this case where – yes, there was evidence that there was some minor drug transactions, but the sole evidence that there was this major conspiracy to distribute methamphetamine and cocaine came from the two other members of the conspiracy who had decided to take pleas and cooperate with the government. So it was a credibility contest. That's why this case wouldn't establish a rule for every other mandatory minimum case, necessarily. The only evidence linking Ms. Larson to this conspiracy came from these two witnesses. Their credibility was central to the government's case. But how is this case different from any other case involving cooperating co-defendants who roll over on the other defendants? This is a pretty typical narcotics case, is it not? In some ways, yes, it is. But I would say certainly when you're looking at minimum mandatory terms, that's a different situation than, say, in the DeDinian case where the questions went to the statutory maximums. And to the – certainly to the extent that, you know, as I stated before, that the only evidence linking Ms. Larson to this conspiracy were these two defendants, their bias, their motivation was critical. Isn't the most important piece of the puzzle that the witnesses have to please the prosecutor? And isn't that precisely what you were allowed to cross-examine about, where you were asking them, isn't there only one person in this room you have to please, and that is the prosecutor sitting over here, and they answered, yes, he's the one we have to satisfy? And it seems to me that that – I guess I don't understand how that isn't the most important piece of the puzzle. First of all, I think, and this maybe touches on a little different subject, but when the district court stated to the jury that it had sole discretion as to what these defendants' sentences were, I think that any force of that cross-examination was pushed back. But that's not your assignment of error. Your assignment of error is that you should have been allowed to ask a follow-up question on the length of the sentence, because the witnesses already testified they faced prison, and only the prosecutor could help them out to get a lower sentence. And so what you were seeking, as I understood it, was the opportunity to ask them just how long the sentence was that they were getting a hoped-for reduction from. My assignment of error is that we were not allowed to properly expose the motive and bias of these witnesses. Now, whether or not I was able to, through other questioning, engage in sufficient cross-examination, that is where I think the judge's statements to the jury comes in, because that vitiates, I think. It undercuts an argument that we were actually allowed to expose these witnesses' biases and motivations. But I need to come back. I think that it is relevant, it's highly relevant to a jury to see exactly what sort of detriment. What additional questions would you have asked had you not been stopped by the judge? I would have established that these witnesses were looking at minimum mandatory terms of life imprisonment and 5 years. Well, you established that with Ms. Larson. It wasn't stricken. It wasn't stricken. It's the evidence that she was going to prison for a minimum of 5 years, right? Yes. But then the judge said, Mr. Ness, that's an improper question. He turned and told the jury that sentencing was up to him. It's not a proper subject of cross-examination. It was never stricken. I mean, it's just part of the rule. And certainly, Mr. Lemire, I didn't get to question Mr. Lemire at all. Part of the problem is we don't know what you would have questioned because there's no proper. We just don't know that. When I asked the Court for permission to recall them, I told the Court, I asked the Court that I wanted to recall them so that they could testify about the minimum mandatory terms, so that we could expose that to the jury. That is what I told the judge. That's what I was seeking to do. If we did reverse and remand, I presume by this time that Lemire has actually been sentenced? He's, my understanding is the question is yes or no. Yes. Do you know what he got? He received, I believe it was 420 months, but it's my understanding that's been cut again. And he's down to 320 months. But whatever it is would be a known quantity. I'm sorry? If there were a retrial, whatever Lemire's sentence would be a known quantity, no guessing. At this point, yes, yes. Even though there was no proffer, on the additional question, right here, additional questions you would have asked, now that you've had a chance to think about it, I'm What additional questions besides the mandatory minimum sentence would you ask? I would have asked that. I would have elicited that the, again, the prosecutor was the only person that certainly They already did that. Okay. What else? What else? It wouldn't have gone much beyond eliciting exactly what the minimum mandatory term these individuals were facing. Excuse me. You have only about two minutes left. Mr. Obediuri, do you intend to present any argument? All right. Thank you. I think I'll sit down and respond. All right. Thank you. Good afternoon. My name is Joe Thagard. I'm an assistant United States attorney from Great Falls, Montana. I prosecuted this case, and I represent the government. I'll turn briefly to the issue of the standard of review, which I recognize is subject to some question at this point in the circuit. And I would have to suggest that I think that there is this initial sort of screening to see if there would have been some sort of a cutoff of all inquiry that would go to bias and motivation. And I would agree that that, I think, would initially be de novo. Thereafter Do you get that from the Supreme Court's decisions in Ben Arstow and Davis? So we're really not reviewing this whole thing afresh. It's actually controlled by Supreme Court law, right? Exactly, Your Honor. Right. And with that, I'll turn away from the standard of review. In this case, of course, the issue is whether or not this defendant was able to show not only whether Poitra and Lemire were biased, but why. And with respect to Ms. Poitra, I think that the transcript speaks for itself, and I won't belabor the point. The defense attorney was allowed to ask the question, and you're facing five years, right? Yes, Your Honor. And that answer came out. That's correct, Your Honor. He didn't move to strike it. I did not, Your Honor. Later on in the testimony, when Lemire testified, he indicated that he had had, what, seven felonies? That's correct, Your Honor.  That's correct, Your Honor. So by not moving to strike, by not even objecting to the question, you left the jury with the impression that one witness was facing five years and perhaps the other one was facing five years also? Well, no, I don't believe so, Your Honor. I would note that actually when the question was asked regarding how much time he had spent in prison on his previous felonies, that I actually objected to that. With respect to Ms. Poitra, I didn't have a chance to object before the district court actually did that suit. But you didn't move to strike. No, I did not, Your Honor. Can I ask you the same question I asked your opponent? Have you been able to find any recorded Federal court of appeals case anywhere in the country that deals with not allowing a defendant to cross-examine a cooperating witness about a mandatory minimum sentence? Your Honor, no. The closest one, I believe, is Brown v. Powell, which is the case from the First Circuit, which is cited by the three-member panel. And it's not quite on point, but it's pretty close. Any case that involves a witness that was facing mandatory life without the possibility of parole? None, Your Honor. Counsel, to follow up on what Judge Hawkins asked, if the concern is that the jury would gain improper information in thinking that the sentence that the defendant faced would be whatever the answer was to the question, and that's why you didn't want to do that, that's why somebody, not the judge, not you, but someone thinks that that would be an improper question because the jury would get the wrong impression about the sentence being faced, that sentence would be the 5-year sentence, not the life sentence, because they already were told one of them had 5 years. That's correct in that instance, Your Honor. So that doesn't seem to be an issue in this case, because the jury already knew what the sentence was of one of them without objection. Certainly with respect to Poitras, I believe that's correct, Your Honor. So that the issue here really isn't whether this question is about, you know, the life sentence, whether that question should be asked or not has nothing to do with the question of whether the jury would be misled or informed improperly. You didn't take that position, did you? Well, we do take that position, and I certainly didn't argue it at trial, Your Honor, because really of the sort of unique way this developed procedurally. As the panel is aware, the question was never really asked of Mr. Lemire. Mr. Ness never asked that question. Mr. Obey never asked that question. Later during the portion where they were making their Rule 29 motion, they asked for permission to recall these witnesses and ask them about the mandatory minimums. So we weren't really given an opportunity to make a record on that. But that certainly is one of our concerns, is that the jury might very well have to But you weren't concerned that they recalled about the five-year sentence? I was concerned about that, Your Honor, but You didn't object to it, though. As I say, I didn't have an opportunity to. Well, you testified to it. You didn't move to strike it, did you? That's correct, but it all happened in fairly short order. Well, that happens in trials to both sides. Yeah, it does, Your Honor. Yes, perfectly. Well, what actually happened is you did make an objection. I mean, I think that if you were to assume there was error, then you'd have to say that the government has the Chapman burden of showing that it was harmless behind a reasonable doubt. I think there's been some suggestion that, in fact, the question was answered. But if you actually read the transcript, and this probably did go fast and went so fast that maybe the reporter got in the answer, yes, you didn't really have an opportunity to move to strike. And then the judge goes off kind of on this wrong understanding of the law. And then the next time it's asked, you do object, because you pick up on the judge isn't going to let this in, right? That's correct. And frankly, I was just more attuned to what was going on. I mean, I hate to confess it, but I just wasn't as fast as I should have been the first time around. Well, suppose you were to find that there was error. Tell me how to explain what you would rely upon to demonstrate that it was not harmless beyond a reasonable doubt. Well, I would start with the fact that with respect to the examination of Poitras and Lemire, they both conceded that the only way they were going to get a reduced sentence was with a motion from the government. I think it was very clear from both of those witnesses that that was what the deal was. And I don't think it could have been any more clear that, in fact, they were there and they were dependent essentially upon the government concluding that they had assisted the government and given substantial assistance. And so, first of all, I would point out that. With respect to Poitras, I would point out the fact that they also brought out the fact that she had this young child, that she did not want to be separated from this child, and that, you know, going to prison, of course, would cause such a separation. There were additional credibility issues, sort of general credibility issues, which they got into with her about the fact that she had made some prior inconsistent statements, that she was a drug addict, she was a drug dealer. With respect to Lemire, they were able to get up and brought out the fact that this guy was not a one-time loser or a two-time loser or a three-time loser, but a seven-time loser. He had seven prior felony convictions, that he was a major drug dealer, that he had given inconsistent statements, including during the course of his own change of plea colloquy where he was under oath. And I would be ---- Breyer. The problem I'm having over here. Oh, excuse me, Your Honor. The problem I have is trying to put myself in the mind of a juror who doesn't know all of this. You say he's a seven-time loser. I have no idea as a lay juror what that means. And when the defendant, excuse me, the witness, both of them acknowledged that, yes, they're hoping for a reduction in their sentence. As a juror, I don't know what the significance of it is in the criminal process. If I know that somebody's facing a five-year mandatory minimum, at least that tells me, okay, they're working off five years, and I can start to speculate, perhaps, if the defense counsel isn't allowed to probe further and find out just how far down below the five-year minimum the prosecutor might recommend the judge go, maybe that's a proper area of cross-examination. But, you know, if it's one year off of five year, the woman's still going to lose custody of her child for four years. So I think maybe that's not such a big deal. But if I think that she's going to get zero time, then I can think, wow, well, maybe that really is something. But I move over to the guy that's looking at a life in prison. And if I'm told that if the prosecutor likes his testimony, that he can get out in a matter of, you know, four years or five years or whatever it is, instead of serving the rest of his life in prison, I've got to believe, as a juror, that that might have more of an impact than just some kind of notion that he's looking for a substantial benefit. How do you react to that? Well, the way I react to it is I really think that the three-judge panel had this right when they noted that what is really critical is the reduction and the amount of the reduction. And in this particular case, under these particular facts, we didn't know what the amount of the reduction was going to be because he hadn't received it. The government hadn't even filed a rule of 5K at that point. And so it wasn't by any means clear what he was going to get. And, well, if somebody's looking at a life sentence and they're going to get that substantially reduced, say to five years, that's one matter. But if they're only going to get a day off or two days off, or in this case, Mr. Lemire, who got 460 months initially on the 5K, now it was reduced later to, I believe, 27 years on a Rule 35 for some stuff that he did extraneous. And so I think that's one of the things that we're going to have to look at is how we're going to reduce the amount of the reduction and how we're going to reduce the amount of the reduction from this case to this case. But without being able to capture that reduction, simply questioning the person about the fact that they're getting under the mandatory minimum really doesn't quantify it. And I think that's one of the problems with what's being argued here. Yeah, but you have a situation where, over here, you have a situation where he was convicted of seven felonies, right? That's correct. Seven years, right? That's correct. So, you know, that's entering into the minds of the jurors as well. Then you've got the judge telling the jury that whatever the sentence is, you know, that's up to me. Well, that's flat out incorrect, right? Well, isn't that incorrect? The sentence is not up to the judge. It's up to the prosecutor. The sentence is partially up to the judge, Your Honor. Not if the prosecutor doesn't ask. It's mandatory. That's correct. Yeah. So it's not up to the judge. So that was an incorrect statement, to say the least. So how does that – how would you say that colors this entire situation? Well, I don't think it does, because the jury was still informed what the deal was. They're looking at the judge. The judge tells them this. You know, you have to start out with the assumption that the judge is the one that's got the credibility in this courtroom. Well – He tells them, I'm going to decide. But it was also, again, made very clear – and this was later, after the judge had initially sustained his own objection to the question of Poitras. It was after that that Mr. Ness questioned Ms. Poitras about what the operative deal was with the government. And it was certainly after that that he questioned Lanier about what the operative deal was. And I certainly don't think that I've heard any suggestion that that was misstated by either one of those witnesses. It was very clear that they're here on the government's coattail, and they are dependent upon the government making this motion. Lanier was the key witness against Larson, wasn't he? You know, I don't know that I would say that he was necessarily the key witness, because I think that Poitras was also of particular significance. But she indicated that she had actually obtained some drugs from Labrador, that he would make calls to somebody named Patty, and that they would go over to what she knew to be Larson's home. So I think that her testimony was also very, very significant. Well, no, you said that the – you keep saying that the answer to the question of whether he should be allowed to ask this question is, well, the panel's right. The critical question is something else. Well, that's not really the test in your right to cross-examine whether you may have an even more important issue. The question is whether it's relevant, and I understand from your brief that the question was relevant. Then in order to limit it, it needs to be outweighed by some other consideration. So whether there's another area that's more critical or not doesn't go to whether  What is it that justifies this ruling? The judge seemed to think what justified the ruling was that he was the only one that made the decision, and he was wrong about that. You say, well, this may – now you say this may tip off the jury as to what the sentence would be, and you didn't want them to think it was the wrong thing, but they were already told that one of them had a five-year sentence. So what is it that justifies limiting cross-examination in this case? Well, I think that there are two things. One, I think that the potential for putting that sentence out certainly is one reasonable reason to limit that. Potential doing what? The potential sentence. And secondly, I think it confuses the issues, because what happens is if you get into asking these witnesses, well, what do you think you are really looking at? What are you really going to come down from? Then the jury is hearing essentially this defendant who doesn't know anything about the Federal sentencing guidelines, who may not at that point know exactly how much weight is going to be, you know, put on that witness in the course of the pre-sentence process. Things of that nature – How does the actual sentence matter? I'm over here. Because isn't what important what the witness is thinking? That's what the witness is motivated by. The fact the witness is wrong doesn't change the potential motivation. Well, that's correct. But I still think it goes to the confusion, because what – returning to the – what we suggest is the most important thing is, is that the jury simply needs to understand that this person has a motive potentially to lie, because it's going to get a reduced sentence. Don't the cases say that you not only have a right when you cross-examine a witness like this to know what their motivation might be, but the facts underlying that motivation so you can argue to the jury? Yeah. Yeah. I do agree that you're able to show both whether and why. And I think the why would go to the – Do you really stand here today and say that the argument would not have been stronger had the defense attorney in this case been able to say, this man is facing life in prison for the rest of his natural life without the possibility of parole unless that prosecutor files a motion? No judge, no discretion, no addition, no subtraction, no motion, life without parole. Well, this is what he did tell them about Mr. Lemire. His deal, his sentence, his freedom was dependent on his testimony. And what he said about Poitra was that she cut a deal and had every reason to lie. And as Van Arsdale tells us, the defense is certainly given an opportunity to explore biases and motivation. But they didn't know about the life sentence without possibility of parole, did they? They did not know that. In fact, all they knew was that the code of the other witness was getting five years. So they were actually misled if they were judging by the sentence that was announced. Well, let me ask you this. What's really so terribly wrong with telling a jury what the – what the minimum sentence is in cases like this? I mean, if you're not really asking them to think about the guidelines and spend a lot of time and all the rest of it, what's wrong with telling the jurors what the truth is? Well, for the – It's the truth, isn't it? The truth shall make you free. So what's wrong with telling the jurors what the truth is? Because we don't always capture what the truth actually is. But we know what the truth is here. I don't think that we did at that point. We didn't know what the – You didn't know that the maximum mandatory was life without possibility of parole? We did know that, but we didn't know what the reduction was going to be. Yeah, but that's the truth. What would have happened later depends on you, the prosecutor. Which they were advised of. That's the truth. But they didn't know about the life without possibility of parole. They didn't know how much road on your judgment. You said life without parole. Freedom means a lot of things. Going away for a year is loss of freedom. Going away for life without parole means permanent loss of freedom. You don't think the jury could make a qualitative distinction between those two? Well, I think in this particular case, again, we have to look at what the total cross was and what they were permitted to learn about these people, what they were permitted to learn about the deal. And, again, each case comes, I think, under scrutiny in this particular area on its own particular facts. And these people were certainly portrayed as people who were not upstanding. They were criminals. That's not the question. That goes to the collateral. I'd like to come back to the relevance thing, because I still haven't quite gotten the flow of your analysis here. You agree that it's relevant, and you're arguing that they got enough, but the barrier between what the jury had to deal with and what the defendant would like to put in is this notion that the jury shouldn't, as Judge Pragerson said, know that just the simple truth. The simple truth is that he looked at life without parole. Are you the suggestion by counsel was made for the defense, that is, that the question could have been asked, and your concern, as I understand it, is that the jury would somehow see that sentence out there and make an inference that somehow these defendants are facing life without parole? Are you suggesting that a limiting instruction wouldn't take care of that problem? Well, I think that in this instance, no, because I really do think Larson, Lavenger, and Lemire were all charged with the same crime. Poitras had applied to a superseding information. And really, I would be concerned under those circumstances that a limiting instruction might not be sufficient. So notwithstanding, so many times we say the jury is presumed to follow the instructions, and that cures all sorts of problems for the government when it comes up on appeal. You're saying that that doesn't work in this case. You don't think the jury will follow the instructions. I would certainly be concerned that they would not follow it in this case. Counsel, I'd like to return where you started with the standard of review, because in answering these last series of questions, you've taken the position that had the trial judge made the opposite determination, it would have been erroneous. And I'm not sure why that is so. Isn't there some area in which a trial judge retains discretion so that either choice is permissible? And I don't understand why it wouldn't have been at least permissible, even if not required by the Constitution, which is the argument here, to have said, okay, I'll let you do this and I'll give a limiting instruction. You seem to be saying that would have been error. And I don't understand why you have to go there and why it isn't enough to say, you know, the constitutional minimum was met, and whether there's gravy on top of that is within the trial court's discretion. I guess I just don't follow your argument. Well, and maybe I could have done a better job of making it. And I think that is the bottom line in my case, is that the constitutional minimum was met. So why is it necessary to go beyond that and necessitate a limiting instruction? Well, I guess what I'm wondering is whether do you have to win your argument that you have been making here in the last few minutes that the trial judge would have made a mistake, would have been wrong, had he made a different choice? No. I think under the particular facts of this case, I don't need to win that argument. And again, it's because of the amount of cross-examination that was allowed and what the jury was informed about and what they did learn. Let me ask you this, because it seemed to me that in assessing credibility, a logical question for the juror to ask is what's in it for him to lie? And without the answer to the question that was not allowed to be asked as to what the jury didn't know that, isn't that right? Well, they knew that these people were criminals. They knew that they'd cut a deal with the government. They knew that they wanted to – that certainly Poitra wanted to avoid. Yeah, but they just had to speculate as to what the actual – what the stakes were for the – for the witnesses. Well, I think that a significant enough picture was painted that a jury could look at these two people and say they might be willing to lie to save their own skin. And that's what they did in this instance. And they not only got that information through the trial process, they also got an instruction from the court, from the district court, that said that people who have this sort of an arrangement with the government, that you can view their – their testimony with caution. And I think that that could certainly be of some significance here. And certainly the Seventh Circuit, I think it was in the Orochco case, Orochco, you know, found that such an instruction was something that should be weighed in that – in that instance. I'd also like to, in the time that I have left, briefly return to – or briefly turn to the issue of harmless error. In the event that there's some sort of a finding by the panel that, in fact, there was a sufficient cross-examination of Poitra, at that point, you have a witness who has identified that both Laverger and Larson were involved in this conspiracy. She obtained drugs from Laverger and was, in fact, corroborated to some extent, because in one instance, an informant had went and purchased drugs from her. She left the home. She said that she later left and was observed leaving the home. She said that she met up with Laverger and they got the drugs from Larson. In the event that Poitra's cross-examination was sufficient, certainly that's harmless error, because she basically testifies to everything that Lamer did. And at that point, you know, his testimony really – she really – his testimony essentially becomes cumulative. In closing, I would simply add, simply add to that, I'm not sure – I'm over here. Are you saying basically we can assume the jury would have convicted even without Lamer's testimony at all? I think so. I think in the event that you find that there was a sufficient examination of Poitra, there's one witness certainly who's corroborated, who actually bought drugs from Laverger and who was aware that they were coming from Larson, had overheard the conversations between Larson and Laverger, and the Court is well aware the testimony of one witness, if credible, is sufficient. But that's not the test for harmless error. Well, but I think what it does is in that point – at that point, Lamer's testimony is essentially cumulative of what Poitra offered. And that is something that's considered in a harmless error assessment, as well as the overall strength of the case. And there were – there was, of course, one controlled buy into Larson, and there were several buys into Laverger as well. Did Poitra testify about Fatso? No. That was – that was Lamer. That's pure Lamer, isn't it? That's purely Lamer. That's correct, Your Honor. What was Poitra sentenced to? Poitra got 41 months. If the panel has no further questions, I'll return to my seat. Thank you, Judge. I have the flip side of the question asked by Judge Hawkins. Were there any cases that you were able to find where the failure to examine as to mandatory minimums resulted in a reversal? No, Your Honor. Thank you. If there are no more questions, I'll return to my seat. Thank you. I would just point out that the D.C. Circuit, at least, seems to, as it's been assumed, that a criminal defendant can inquire into minimum mandatory and maximum sentences. And with regard to whether or not a defendant was able to question into statutory minimum mandatories, while the Chandler case didn't specifically involve that, they were allowed to question into what they received under the guidelines and the break that they had gotten or the break that they hoped to get, which isn't a far cry different from minimum mandatory terms. Do you agree if Poitra, if the Poitra cross-examination is held not to have violated the Sixth Amendment, that that kills the case as to, since you're not arguing for your client or both clients? If, yes, no. Would it cure harmless error so that the, all these names floating around, Lemire is purely cumulative and the error would therefore be harmless? I would not. I mean, because we're under the Chapman standard. We're looking at harmless beyond a reasonable doubt. When you take Lemire's testimony out of the equation, I would not agree that under Chapman that the Court could validly find that this error was harmless beyond a reasonable doubt. Sotomayor, are we under Chapman harmless error or are we under Van Arsdale? Judge, first, with regard to Van Arsdale, that goes to whether or not there was a confrontation clause violation. Yes. Also, it's not a construct for harmless error. But then if you assume that there was a confrontation clause violation, then you need to go to the Chapman standard to determine whether or not. Separate and apart from the construct that Van Arsdale sets out. It's basically two steps, as I understand it. You don't think Brecht v. Adamson is the correct rule as to harmless error? Actually, Van Arsdale continues on with Chapman. Van Arsdale, in the majority opinion, finds the error and then goes on with Chapman. That's right. Van Arsdale says that you need to go on to Chapman. We can read them. Thank you. Your time has expired. The case matter just argued is submitted for decision. That concludes the Court's calendar for this session. The Court stands adjourned.
judges: Schroeder, Pregerson, Reinhardt, Rymer, Hawkins, Graber, Wardlaw, Fisher, Gould, Paez, Tallman, Clifton, Bea, M Smith, Ikuta